IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No: _____

CHEVRON CORPORATION,

Petitioner,

To Issue Subpoenas for the Taking of
Depositions and the Production of Documents.

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION AND
APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 PERMITTING CHEVRON
CORPORATION TO ISSUE SUBPOENAS FOR THE TAKING OF DEPOSITIONS AND
THE PRODUCTION OF DOCUMENTS FROM ANDRES SNAIDER**

---

GIBSON, DUNN & CRUTCHER LLP
Randy M. Mastro
Andrea E. Neuman
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035

Robert C. Blume, No. 37130
Allison K. Kostecka, No. 42313
1801 California Street, Suite 4200
Denver, CO 80202-2642
T:  (303) 298-5700
F:  (303) 298-5907

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
T: (213) 229-7000
F:  (213) 229-7520

KOBRE & KIM LLP
Steven G. Kobre
Carrie A. Tendler
Steven W. Perlstein
Jay Y. Mandel
800 Third Avenue
New York, New York 10022
T: (212) 488-1200
F: (212) 488-1220

STERN & KILCULLEN, LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
T: (973) 535-1900
F: (973) 535-9664

*Attorneys for Petitioner Chevron Corporation*

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ............................................................................ 1

II. FACTUAL BACKGROUND ........................................................... 4

    A.    The Lago Agrio Litigation in Ecuador and Related Enforcement
        Proceedings ......................................................................................... 4

    B.    Snaider's Role in the Lago Agrio Litigation ....................................... 12

        1.    Snaider Helps Donziger Convince DeLeon to Invest in *Crude* ............... 12

        2.    Snaider and Nextant Assist in the Procurement of Funding in
               Furtherance of the Fraud Scheme and Join in Ongoing Efforts
               to Enforce a Fraudulent Judgment ............................................. 14

        3.    Snaider Coordinates with the LAPs to Block Discovery in the
               RICO Proceeding ........................................................................ 16

    C.    The Gibraltar Proceeding .................................................................... 17

    D.    Enforcement Proceedings .................................................................... 19

III. ARGUMENT .................................................................................. 20

    A.    The Information Sought Is Highly Relevant and Presumptively
        Discoverable Under Section 1782 ....................................................... 20

    B.    This Application Meets All Statutory Requirements of Section 1782 ................. 21

        1.    Snaider Is Found Within this District, the Discovery Is for Use
               in Foreign Proceedings, and Chevron Is an Interested Person ................. 21

        2.    The Discovery Sought Is Not Privileged .................................... 22

        3.    The Crime Fraud Exception Applies ......................................... 23

    C.    The Discretionary *Intel* Factors Weigh in Chevron's Favor ................ 27

        1.    Respondent Is Not a Participant in the Foreign Proceedings .................. 28

        2.    The Foreign Tribunals Where the Requested Discovery Will
               Be Used Are Receptive to Assistance Under Section 1782 ..................... 28

i

Page

3.  Chevron's Application Is Not an Attempt to Circumvent Foreign Proof-Gathering Restrictions ........................................................ 29

4.  Chevron's Discovery Requests Are Not Unduly Intrusive or Burdensome ............................................................................................. 31

IV.  CONCLUSION ............................................................................................. 33

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A. v. Dist. Court of Second Judicial Dist.*,
  550 P.2d 315 (Colo.1976) ................................................................................................ 25
*Al Fayed v. United States*,
  210 F.3d 421 (4th Cir. 2000) .......................................................................................... 21
*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*,
  244 F.R.D. 614 (2007) .................................................................................................... 32
*Chevron Corp v. Donziger*,
  11 Civ. 0691 (S.D.N.Y. Mar. 15, 2013) ........................................................................ 26
*Chevron Corp. v. Donziger*,
  768 F. Supp. 2d 581 (S.D.N.Y. 2011), *rev'd on other grounds and remanded sub nom.*
  *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) ............................................ 16
*Chevron Corp. v. Donziger*,
  Case No. 11 Civ. 0691 (S.D.N.Y. Mar. 4, 2014) ................................................. passim
*Chevron Corp. v. Salazar*,
  275 F.R.D. 437 (S.D.N.Y. 2011) ........................................................................ 15, 25, 26
*Chevron Corp. v. Stratus Consulting Inc.*,
  No. 10-cv-0047-MSK-MEH (D. Colo. 2010) .................................................................. 4
*Chevron Corp. v. Weinberg Group*, Misc. No. 11-409 JMF (D.D.C. Sept. 8, 2011),
  *vacated on other grounds by Chevron Corp. v. Weinberg Group*, 682 F.3d 96
  (D.C. Cir. 2012) ...................................................................................................... 14, 15
*Chevron v. Champ*,
  Nos. 10-mc-00027 & 10-mc-00028, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ............. 15
*Clark v. United States*,
  289 U.S. 1 (1933) ............................................................................................................ 26
*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ........................................................................................... 29
*First Nat. City Bank of N.Y. v. I.R.S.*,
  271 F.2d 616 (2d Cir. 1959) ........................................................................................... 32
*General Environmental Science Corp. v. Horsfall*,
  136 F.R.D. 130 (D. Ohio 1991) ...................................................................................... 32
*GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*,
  No. 11 Civ. 1299, 2011 WL 5439046 (S.D.N.Y. Nov. 10, 2011) ................................. 23
*In re Applic. of Chevron Corp.*,
  Civil Nos. 10-MC-21JH/LFG, 10–MC–22 J/LFG., 2010 WL 9545704 (D.N.M. Sept. 13,
  2010) ......................................................................................................................... 15, 27
*In re Applic. of OOO Promnefstroy*,
  No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ............................... 29

*In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*,
466 F. Supp. 2d 1020 (N.D. Ill. 2006) ................................................................. 31
*In re Application of Chevron Corp.*,
736 F. Supp. 2d 773 (S.D.N.Y. 2010)................................................................. 21
*In re Application of Chevron Corp.*,
749 F. Supp. 2d 135 (S.D.N.Y. 2010)............................................................ 15, 21
*In re Application of Chevron Corp.*,
Misc. No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265 (N.D. Ga. Mar. 2, 2010) .............. 30
*In re Application of Chevron Corp.*,
No. 10cv1146-IEG(WMC), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010)..................... 15, 27
*In re Application of Chevron Corp.*,
No. 4:10-mc-134, 2010 WL 8814519 (S.D. Tex. Apr. 5, 2010)............................... 30
*In re Application of Winning (HK) Shipping Co. Ltd.*,
2010 WL 1796579 (S.D. Fla. Apr. 30, 2010) ........................................................ 22
*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998)...................................................................... 20, 29, 30
*In re Chevron Corp.*,
709 F. Supp. 2d 283 (S.D.N.Y. May 6, 2010, as corrected May 10, 2010)..................... 10, 30
*In re Chevron Corp.*,
749 F. Supp. 2d 141 (S.D.N.Y. 2010)................................................................. 15
*In re Chevron*,
753 F. Supp. 2d (D. Md. 2010) ................................................................... 28, 30
*In re Clerici*,
481 F.3d 1324 (11th Cir. 2007) ....................................................................... 3
*In re Grand Jury Proceedings*,
616 F.3d 1172 (10th Cir. 2010) ..................................................................... 23
*In re Grand Jury Proceedings*,
857 F.2d 710, 712 (10th Cir.1988) ................................................................... 24
*In re Grand Jury Subpoena Duces Tecum*,
731 F.2d 1032 (2d Cir. 1984)...................................................................... 24, 26
*In re Grand Jury Subpoenas*,
144 F.3d 653 (10th Cir. 1998) ......................................................................... 24
*In re IPC Do Nordeste, LTDA, For an Order Seeking Discovery Under 28 U.S.C. 1782*,
12-50624, 2012 WL 4448886 (E.D. Mich. Sept. 25, 2012) .................................... 29
*In re Ishihara Chem. Co.*,
121 F. Supp. 2d 209 (E.D.N.Y. 2000) .................................................................. 3
*In re Lancaster Factoring Co. v. Mangone*,
90 F.3d 38 (2d Cir. 1996) ............................................................................. 22
*In re Oxus Gold PLC*,
2007 WL 1037387 (D.N.J. Apr. 2, 2007) ............................................................. 22

TABLE OF AUTHORITIES
(continued)

*In re Strand Invs. Ltd.*,
  No. 09-21985-CIV-MORENO, 2009 U.S. Dist. LEXIS 76445 (S.D. Fla. July 24, 2009) ....... 22

*In re Veiga*,
  746 F. Supp. 2d 25 (D.D.C. 2010) ........................................................................................... 30

*Intel Corp. v. Adv. Micro Devices, Inc.*,
  542 U.S. 241 (2004) ................................................................................................... passim

*London v. Does 1-4*,
  279 F. App'x 513 (9th Cir. 2008) ..................................................................................... 31, 33

*Minatec Fin. S. Á.R.L. v. SI Group Inc.*,
  No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ...................... 30

*Perkins v. Federal Fruit & Produce Co., Inc.*,
  No. 11-cv-00542, 2011 WL 6937195 (D. Colo. Dec. 30, 2011) ........................................... 23

*Pott v. Icicle Seafoods, Inc.*,
  945 F. Supp. 2d 1197 (W.D. Wash. 2013) ............................................................................. 29

*Republic of Ecuador v. Bjorkman*,
  No. 11-cv-01470-WYD-MEH (D. Colo.) .................................................................................. 4

*Ryskamp ex rel. Boulder Growth & Income Fund v. Looney*,
  2011 WL 3861437 (D. Colo. 2011) ........................................................................................ 25

*Searock v. Stripling*,
  736 F.2d 650 (11th Cir. 1984) ............................................................................................... 32

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Prop. LLC*,
  No. 01 CIV 9291 (JSM), 2002 WL 1455346 (S.D.N.Y. July 3, 2002) .................................. 23

*U.S. v. Ghavami*,
  882 F. Supp. 2d 532 (S.D.N.Y. 2012) .................................................................................... 23

*United States v. Gasparik*,
  141 F. Supp. 2d 361 (S.D.N.Y. 2001) .................................................................................... 27

*United States v. Harnage*,
  662 F. Supp. 766 (D. Colo. 1987) .......................................................................................... 26

*United States v. Hodge and Zweig*,
  548 F.2d 1347 (9th Cir.1977) ................................................................................................ 26

*United States v. Johnston*,
  146 F.3d 785 (10th Cir. 1998) ........................................................................................... 23, 24

*United States v. Kerik*,
  531 F. Supp. 2d 610 (S.D.N.Y. 2008) .................................................................................... 26

*United States v. Richard Roe, Inc.*,
  68 F.3d 38 (2d Cir. 1995) ...................................................................................................... 25

*United States v. Sutton*,
  732 F. 2d 1483 (10th Cir. 1984) ............................................................................................ 24

*Wiwa v. Royal Dutch Petroleum Co.*,
  Case No. 96 Civ. 8386, 2009 WL 529224 (S.D.N.Y. Feb. 17, 2009) ................................... 32

**Statutes**

28 U.S.C. § 1782 ............................................................................................................ 1, 3, 20, 21

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Tex. Bus. Org. Code § 101.254 ................................................................................................. 32

**Other Authorities**

8 Charles Allan Wright, Arthur R. Miller & Mary K. Kane, Fed. Prac. & Proc. § 2016.4 (3d ed.1998) ...................................................................................................................... 24

# I.     INTRODUCTION

Pursuant to 28 U.S.C. § 1782 ("Section 1782"), applicant Chevron Corporation

("Chevron") respectfully applies to this Court for an order to conduct discovery from Andres

Snaider, a resident of Boulder, Colorado.  Chevron seeks this discovery in aid of its case before

the Supreme Court of Gibraltar against James Russell DeLeon ("DeLeon") and an investment

vehicle he controls, Torvia Limited ("Torvia"), *Chevron Corp. v. James Russell DeLeon and*

*Torvia Limited*, Claim No. 2012 – C – 232 (Supreme Court of Gibraltar) (the "Gibraltar

proceeding"), as well as enforcement proceedings Chevron is facing in multiple jurisdictions (the

"Enforcement Proceedings").

In the Gibraltar proceeding, Chevron alleges claims for unlawful means conspiracy,

conspiracy to injure, and unlawful interference with economic interests.  These claims are based

on the provision by DeLeon and Torvia of millions of dollars in funding for what the U.S.

District Court for the Southern District of New York, following a seven-week trial, found to be

an extortionate enterprise against Chevron in violation of the Racketeering Influenced and

Corrupt Organizations Act, 28 U.S.C. §§ 1961 *et seq*. ("RICO").[1]  That Court concluded that the

evidence demonstrated that the enterprise used criminal means, including attempted extortion,

wire fraud, money laundering, obstruction of justice, witness tampering, and violations of the

Foreign Corrupt Practices Act, to procure a corrupt $9.5 billion judgment from an Ecuadorian

---

[1]     *Chevron Corp. v. Donziger*, Case No. 11 Civ. 0691, ___ F. Supp. 2d ___, 2014 WL 815961, at *5 (S.D.N.Y. Mar. 4, 2014) (RICO Opinion at 402–03); *see also* 2014 WL 815553; 2014 WL 815613; 2014 WL 815715; 2014 WL 815869; 2014 WL 815923; 2014 WL 815961; 2014 WL 816086.  Because the RICO Opinion is split across several Westlaw Reporter citations, citations to page numbers throughout this brief will be to the docketed version of the Opinion available on PACER.  *Chevron Corp. v. Donziger*, Case No. 11 Civ. 0691 (S.D.N.Y. Mar. 4, 2014) (Dkt. 1874), hereinafter "RICO Opinion."

court, including by promising the judge $500,000 of the proceeds if he let them ghostwrite the court's judgment in their favor. In denying DeLeon and Torvia's motion to dismiss the Gibraltar proceeding, the Gibraltar court recently concluded that Chevron had established a prima facie case that DeLeon and Torvia were part of this fraudulent scheme. The Gibraltar court held that "[Chevron's factual allegations] do support the conclusion that [DeLeon and Torvia] were conspirators and fully involved in the conspiracy, continuing to fund it well after they were aware of the fraudulent activities," and that "the stronger the case of fraud became, the more involved the Defendants became." Ex.[2] 4 (*Chevron Corp. v. James Russell DeLeon and Torvia Limited*, Claim No. 2012 – C – 232 (Supreme Court of Gibraltar)).

Snaider is a founder and manager of Nextant LLC, a business consulting firm based in Houston, Texas. Ex. 5. He has helped raise funds for the Lago Agrio litigation from DeLeon since 2006. Chevron seeks discovery from Snaider because he played an integral role in procuring the funding from DeLeon and Torvia that was used to further the RICO enterprise. Evidence shows that Snaider and the business he founded, Nextant LLC, were instrumental in procuring funds from DeLeon that were used to bribe a supposedly neutral court-appointed damages expert in the Lago Agrio litigation, who then submitted a ghostwritten report to the court opining that Chevron should be held liable for billions of dollars in damages. Funds obtained from DeLeon were also used to fund the LAPs' extortionate enforcement scheme, which involves multiple foreign enforcement proceedings throughout the world, a scheme that the Southern District of New York has determined is "vexatious." RICO Opinion at 384–87,

---

[2] All references to "Ex. __" herein are to the Declaration of Allison Kostecka, filed concurrently, unless otherwise noted.

471.  Snaider was also instrumental in creating the structure the conspirators are using to hold and distribute proceeds of the corrupt Ecuadorian Judgment, Amazonia Recovery Limited ("Amazonia"), a Gibraltar company controlled through a complex set of offshore entities. Finally, Snaider has also colluded with the LAPs' representatives to block discovery in the RICO Proceeding by purporting to assume Donziger's role as lead U.S. Representative for the LAPs. Snaider has information directly relevant to the knowledge and involvement of DeLeon and Torvia in the fraud in the Ecuadorian proceeding, which is relevant to Chevron's pending claims against DeLeon.

Section 1782 was designed "to liberalize the assistance given to foreign and international tribunals." *In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007) (citation omitted).  It authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a).  The requirements for issuance of a Section 1782 subpoena are minimal and are met by this application.  *See, e.g.*, *Intel Corp. v. Adv. Micro Devices, Inc.*, 542 U.S. 241, 249, 264–65 (2004).  Further, courts typically address Section 1782 applications on an *ex parte* basis, *see, e.g.*, *In re Ishihara Chem. Co.*, 121 F. Supp. 2d 209, 210 n.1 (E.D.N.Y. 2000), but Chevron proceeds by noticed motion.  Accordingly, Chevron hereby respectfully requests that the court grant this application for an order to conduct discovery from Snaider, including document discovery and a deposition for use in the Gibraltar proceeding and various Enforcement Proceedings.[3]  *See* Ex. A.

---

[3]  Since 2009, Chevron, the LAPs, and the Republic of Ecuador all have sought Section 1782 discovery from multiple sources in aid of the ongoing Lago Agrio litigation, as well as

*(Cont'd on next page)*

## II.   FACTUAL BACKGROUND

### A.   The Lago Agrio Litigation in Ecuador and Related Enforcement Proceedings

The background of the underlying dispute between Chevron and the LAPs is set forth in detail in the Southern District of New York's RICO Opinion.  *See* RICO Opinion at 5–33. However, for the convenience of the parties and the court, Chevron will briefly address that background here.

In 2003, Steven Donziger, a New York lawyer and a defendant in Chevron's RICO suit filed the Lago Agrio litigation against Chevron, along with other U.S. and Ecuadorian lawyers, seeking damages for purported environmental harm caused by oil operations in Ecuador. Chevron never operated in Ecuador, but in 2001 it acquired Texaco, whose subsidiary, TexPet, was part of a consortium with Ecuador's state-owned oil company, Petroecuador, which explored and drilled for oil in a specified area of the Ecuadorian Amazon from 1964 to 1992.  RICO Opinion at 5-6.  Petroecuador was the majority owner of the consortium and took over as sole operator in 1990.  *Id*. at 6–7; Ex. 7.  TexPet has had no ownership or involvement in oil operations in Ecuador since 1992.

When winding up operations in Ecuador, TexPet agreed to perform remediation of oil production sites commensurate with its approximately one-third minority interest in the Consortium in exchange for a release from any liability arising out of the Consortium's

---

*(Cont'd from previous page)*

> related international arbitration between the Republic of Ecuador and Chevron, including before this court.  *See Chevron Corp. v. Stratus Consulting Inc.*, No. 10-cv-0047-MSK-MEH (D. Colo. 2010) ("Stratus 1782"); *Republic of Ecuador v. Bjorkman*, No. 11-cv-01470-WYD-MEH (D. Colo.).  All of those applications have been granted.  Ex. 6.

operations. Exs. 8–12. Petroecuador committed to remediating the remaining sites, a process which it did not begin until over a decade later. Ex. 13. Despite these facts, the LAPs struck a deal not to sue or seek any recovery from the Republic of Ecuador or Petroecuador for their claims of environmental harm in exchange for the Ecuadorian government's support of the LAPs. Ex. 14; RICO Opinion at 13–14.

Rather than trying to prove their claims on the merits, the LAPs soon resorted to fraud in the Lago Agrio litigation. At the outset of the case, the court ordered a series of 122 "judicial inspections" of oil-production sites to be conducted by experts nominated by each side, Ex. 15, with any disputes between the parties' experts to be resolved by the Ecuadorian court's panel of independent "settling experts." The first site for which the settling experts issued a report was the Sacha-53 site. As the Southern District of New York noted in the RICO Opinion, "[t]he Sacha-53 site was important for the LAPs because, as Donziger explained to his colleagues in a contemporaneous email, it was . . . a site that Texaco had remediated pursuant to its agreement with the ROE as a prerequisite to obtaining the release," and Donziger was hoping it would provide "'the first definitive scientific proof in the case to put the lie to their claim they remediated.'" RICO Opinion at 60 (quoting DONZ-HDD-0068586-87 (Ex. 16)). That is not what happened, however. The settling experts agreed with the findings of Chevron's experts that the Sacha-53 site posed no risk to human health or the environment, and that TexPet's remediation had been properly performed. Ex. 17 at 76; RICO Opinion at 65. "Donziger characterized the report as 'disastrous' for the LAPs' team." RICO Opinion at 65. The LAPs also forged reports for one of their judicial inspection experts, Charles Calmbacher, purporting to find harmful contamination, and submitted them to the Lago Agrio court without Calmbacher's

permission after Calmbacher told them he was not finding evidence of harmful contamination at the sites he inspected.  As he later testified when shown the reports at a deposition, "I did not reach these conclusions and I did not write this report."  Ex. 18 at 116:9-10.

As set forth in the RICO Opinion, the LAPs then decided to try to end the judicial inspections altogether, and began pressuring the presiding judge to do so.  RICO Opinion at 67– 69.  The judge, in Donziger's words, was "on his heels from the charges of trading jobs for sex in the court," so they threatened him with a complaint against him that they had "prepared but not yet filed."  Ex. 19 at 1.  The judge ultimately "accept[ed] [the LAPs'] request to withdraw the rest of the inspections" (*id.*) and agreed to replace the panel of independent settling experts with a single "global expert" whom Donziger thought would be easier to control.  Exs. 20–21; RICO Opinion at 69–76.

Donziger started vetting candidates for this role, looking for someone who would "totally play ball with us and let us take the lead ***while projecting the image that he is working for the court***."  Ex. 22 at 30 (emphasis added).  After meeting with him and satisfying himself that he would "play ball," Donziger ultimately chose Richard Stalin Cabrera Vega to serve as the global expert.  The LAPs' team then turned its focus to making "100% sure the judge would appt Richard" as the global damages expert, even though they publicly nominated another candidate to make it seem as if it were the Lago Agrio court's decision to appoint Cabrera.  *Id.* at 18; *id.* at 11–12.

As the Southern District of New York noted in the RICO Opinion, "By February [2007] . . . Donziger and the LAP team were so sure of Cabrera's appointment that they proceeded on the basis that Cabrera would be appointed even before the appointment was announced and

Cabrera sworn in." RICO Opinion at 76. Indeed, even before the Lago Agrio court officially appointed Cabrera, Donziger and other members of the LAPs' legal and technical team held a planning session with Cabrera where they explained that they would perform Cabrera's work—"the work isn't going to be the expert's." Exs. 1–2 at CRS-191-00-CLIP-03, CRS-187-01-CLIP-02. The next day, when the LAPs' U.S. technical consultants expressed concerns about the lack of evidence of groundwater contamination, Donziger advised that evidence was all "smoke and mirrors and bullshit" and that "we have enough to get money, to win" because in Ecuador the key thing was to get "a thousand people around the courthouse" to pressure the court. Exs. 1–2 at CRS-195-05-CLIP-01; RICO Opinion at 80. As Donziger told his co-conspirators, "all this bullshit about the law and facts . . . in the end of the day it is about brute force . . . . [The judge] never would have done [Cabrera's appointment] had we not really pushed him." Ex. 1–2 at CRS-361-11-CLIP-01; RICO Opinion at 115.

The LAPs' attorneys and consultants at Stratus Consulting, a Colorado consulting firm, then secretly drafted Cabrera's work plan, directed all of his work, and then drafted, revised, and ultimately translated from English into Spanish Cabrera's report, which concluded that Chevron should be held liable for more than $16 billion in damages. All the while, they concealed their activities from Chevron, at the same time that Cabrera and the LAPs repeatedly told the Lago Agrio court that Cabrera was "independent" and that Chevron's allegations that the plaintiffs were colluding with him were "an insult." Ex. 23; RICO Opinion at 117.

The LAPs' representatives then delivered a 4,000 page "report" to Cabrera right before he filed it, unaltered, under his own signature. Ex. 24 ¶¶ 3a, 8–19; Ex. 25 at 2165:2–8, 3833:3–3834:6–19, 2433:8–14; *see also* Exs. 26-28. As the New York court recognized, "it is clear that

7

Donziger had the final word on every annex and every piece of the [Cabrera] report." RICO Opinion at 105.

To conceal their wrongful conduct and "jack up" (as Donziger put it) their damage claim further, the LAPs' attorneys and consultants filed fabricated objections to the "Cabrera" report they had just written, purporting to criticize it as "unjustly favorable to" Chevron. Ex. 29 at 40. They then ghostwrote a supplemental report for "Cabrera" purporting to respond to their own objections and raise the damages estimate to $27 billion. Exs. 30–32.

The conspirators bribed Cabrera with the help of DeLeon's funding. Exs. 33–46; Ex. 25 at 2137:9–16; 4503:22–4505:11; RICO Opinion at 384–87. These illicit payments are documented in their own internal emails, in which they used a code word—the "Wao"—to identify Cabrera, and discussed establishing a "secret account" to funnel him money. *See* Exs. 37–41, 47, 25 at 3783:6-3784:25, 4847:2-24, 4853:6-4859:7; RICO Opinion at 384–87. Over the course of the following three months, the LAPs' team funneled at least $100,000 through this secret account to Cabrera. Ex. 34–36, 38, 39, 41, 42, 44, 48 at BPNA000436-37, 25 at 4848:11-4849:11, 4860:20-4862:4, 4869:24-4878:12, 4883:10-4888:11; RICO Opinion at 152–53. They also provided Cabrera with an office, life insurance worth $1 million, and an "assistant" who happened to be the girlfriend of a member of the LAPs' legal team so "we'd have this situation more or less controlled." Ex. 46; Ex. 37; RICO Opinion at 325–26.

When Chevron sought discovery pursuant to Section 1782 from Stratus Consulting in the fall of 2009, the conspirators began to panic. One of the Ecuadorian lawyers emailed the team in March of 2010 that if the truth about their ghostwriting of the Cabrera Report emerged, they might all "go to jail." Ex. 49. Instead of coming clean, however, the LAPs' counsel doubled

down on the fraud, embarking on an obstruction campaign to prevent the truth from emerging. RICO Opinion at 388-89. This obstruction campaign caused multiple attorneys to withdraw from representing the LAPs due to ethical concerns and was found by the New York court to constitute obstruction of justice, a RICO predicate act. *Id*.

The LAPs' attorneys and representatives also embarked on an effort to "cleanse" the Lago Agrio court record of the Cabrera fraud through the submission of new expert reports written by experts who would do no independent investigation of their own but would instead rely on the Cabrera report. Ex. 50. These experts were not told, however, that Cabrera's report was not the work of an independent expert. RICO Opinion at 178-79; *see, e.g.*, Ex. 51 at 140:21–141:11, 171:18–172:3, 225:6-25; Ex. 52 at 63:3–9, 68:21-69:4, 59:20–60:2; Ex. 53 at 114:8–19, 224:20–225:20, 276:8–20; Ex. 54 at 52:2–10.

At the same time they were perpetrating the Cabrera fraud, Donziger and his co-conspirators carried out a campaign of harassment and threats against Chevron in an effort to force Chevron to settle the Lago Agrio litigation. They touted their fraudulent evidence, including the Cabrera reports and their allegation that Chevron was liable for $27 billion. They harassed Chevron executives and shareholders and sent misleading letters to multiple state and federal agencies to try to spur "investigations" of Chevron that the LAPs' lawyers could "facilitate going away at the right time" for the right price. Exs. 1–2 at CRS170-00-CLIP00; Exs. 56–60. The LAPs' lawyers also colluded with the Ecuadorian government and particularly the administration of Ecuadorian President Rafael Correa to bring bogus criminal charges against the TexPet attorneys who were involved in the settlement and release agreements, something Donziger expected to be "[t]he key issue" to "force [Chevron] to the table for a possible

settlement." Exs. 1–2 at CRS221-02-CLIP01.3A; Ex. 22 at DONZ00036266, Ex. 61.

Also for the purpose of pressuring Chevron, the conspirators solicited a documentary filmmaker to make a film about the case, released as *Crude*. Snaider persuaded DeLeon to invest in *Crude*. Ex. 62; Ex. 63. Chevron sought the *Crude* footage in a Section 1782 proceeding against the documentary filmmaker, *In re Chevron Corp.*, 709 F. Supp. 2d 283, 287, 299, 310 (S.D.N.Y. May 6, 2010, as corrected May 10, 2010) ("*Berlinger*"), and as one federal court noted, the footage of the *Crude* outtakes "sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct." *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, Dkt. 77, slip op. at 3–4 (D.N.M. Sept. 2, 2010) (attached as Ex. 64). The outtakes showed, among other things, the conspirators meeting with Cabrera to plan the drafting of his reports before he was even appointed by the Ecuadorian court, Donziger bemoaning the corruption of the Ecuadorian judiciary, and members of the LAPs' own publicity team wondering, during discussions of a plan to shut down the Ecuadorian court with a "massive protest," whether "anyone could subpoena these videos," because it's "illegal to conspire to break the law." Exs. 1–2 at CRS-350-04-CLIP-02; *see also* Ex. 1 at CRS-350-04-CLIP-01; CRS-361-11-CLIP-01.

Despite this substantial evidence of fraud and corruption, the Ecuadorian court issued a judgment on February 14, 2011 ("the Judgment"), holding Chevron liable for approximately $18.2 billion in damages, including an $8.6 billion "civil penalty" for failing to publicly "apologize." Ex. 65.[4] Despite the evidence that the Cabrera report was ghostwritten by the

---

[4] Ecuador's National Court of Justice eliminated the penalty, reducing the judgment to $9.5 billion. Exs. 66–67.

LAPs' own lawyers and consultants, the Ecuadorian court nonetheless relied on aspects of the Cabrera Report in the Judgment. RICO Opinion at 179–82; RICO Appendix at 54.

Following its issuance, Chevron uncovered evidence that the Judgment itself was the product of improper collusion between counsel for the LAPs and the Ecuadorian court. As the Southern District of New York found, the LAPs attorneys' internal work product, at least eight documents that "appear nowhere in the Lago Agrio court record," "appear *in haec verba* or in substance in the Judgment," like "fingerprints." RICO Opinion at 201; Exs. 68-71; Ex. 24. The New York court also determined that the presiding judge, Judge Zambrano, who testified at the RICO trial, "did not write the Judgment issued under his name. He was astonishingly unfamiliar with important aspects of its contents. His testimony at trial was evasive and internally inconsistent." RICO Opinion at 199. Evidence presented at the RICO trial—including the testimony of another former Ecuadorian judge, Alberto Guerra, who testified that he served as Judge Zambrano's ghostwriter, solicited a bribe from the LAPs to issue a ghostwritten decision at Zambrano's behest, and then helped to edit the LAPs' draft of the judgment—established that the LAPs procured a judgment from the Ecuadorian court in their favor by promising Zambrano a $500,000 share in any judgment proceeds. Ex. 72 ¶¶ 41-43. As the Southern District of New York found after examining voluminous evidence and oral and written testimony given at trial by multiple witnesses: "(a) Zambrano agreed with Fajardo to fix the case for a payment of $500,000 paid out of any judgment proceeds, (b) Fajardo did so with Donziger's express authorization, (c) the LAPs drafted all or most of the Judgment, and (d) Zambrano signed their draft without consequential modification as part of the quid pro quo for the promise of $500,000." *See* RICO Opinion at 182–281.

As described below, Snaider's involvement was key to securing the financing which allowed Donziger and the other LAPs' representatives to perpetuate this scheme even after the truth about the fraudulent and criminal conduct began to emerge.

**B.      Snaider's Role in the Lago Agrio Litigation**

**1.      Snaider Helps Donziger Convince DeLeon to Invest in *Crude***

Snaider is an Ecuadorian national and graduate of Harvard Law School. Ex. 73. He is a founder and manager of Nextant LLC, a business consulting firm based in Houston, Texas with additional offices in Seattle, Bogotá, and Buenos Aires. Ex. 5, 74–78.

Snaider has been involved with the Lago Agrio litigation since 2006. Donziger, Snaider, and DeLeon all attended Harvard Law School in the late 1980s. Over the years, Donziger and Snaider communicated sporadically. *See, e.g.*, Ex. 79-81. Snaider and Donziger decided to approach DeLeon, who had made a considerable fortune in online gaming, about investing in *Crude*. Ex. 82. Snaider told Donziger that he would forward information about *Crude* to DeLeon and that if DeLeon "[wa]sn't smitten right off [he would] ask [Donziger] to send the trailer." *Id.* Days later, Donziger emailed Snaider, copying Berlinger, pretending that the two had not previously discussed having DeLeon invest in the documentary. Ex. 83 at 3–4. Donziger wrote that the film "has a lot of momentum and is bound to attract a lot of attention" that Berlinger "and his investors have made a lot of $$$" off his previous films and asked Snaider if he "had any ideas about anyone who might be interested" in investing in the film. *Id.* at 4. From there, Donziger worked with Berlinger to send materials for Snaider to send "to the billionaire," and referring to Snaider as "the billionaire's contact." Ex. 84; Ex. 83. Snaider forwarded Donziger's message to DeLeon, who asked for proposed terms. Donziger

immediately told Berlinger that the "billionaire is interested."  Ex. 85; Ex. 86.

Donziger began to communicate with DeLeon directly, but kept Snaider in the loop with his progress in convincing DeLeon to invest.  Ex. 87 (Donziger forwarding Snaider an email sent to DeLeon regarding investing); Ex. 88 (Donziger telling Snaider that DeLeon seemed interested in investing); Ex. 89 (Donziger telling Snaider that DeLeon was likely to invest); Ex. 63 (Donziger alerting Snaider that DeLeon was likely to invest "25% of the budget" of Crude "pending approval of legal docs").  DeLeon ultimately invested approximately $700,000 for the production of *Crude*.  Ex. 90 at 414:9-12.  To show his gratitude, Donziger attempted to negotiate a finder's fee for Snaider.  Exs. 91-96; Ex. 89 (Snaider thanking Donziger for the fee offer but stating that he became involved to help Donziger, "and not as a business").

After funding *Crude*, DeLeon became a substantial investor in the Lago Agrio litigation itself.  *See supra*, Section II.B.1; Ex. 45; RICO Opinion at 82–83, 89–95, 152–53, 384–85 (detailing how Donziger used the funds provided by DeLeon in March 2007 and committed money laundering when using part of DeLeon's $1 million investment to bribe Cabrera).

By the end of 2010, DeLeon had invested more than $3.25 million in the litigation, both individually and using Torvia, and provided hundreds of thousands more to Donziger personally.  Ex. 97; Exs. 98–99 (March 2007 $1 million investment); Exs. 100–101 (June 2009 investment of $500,000, later acknowledged in the March 2010 agreement); Exs. 101–102 (March 2010 investment of $500,000); Exs. 103–104 (June 2010 $250,000 investment); Exs. 105–106 (August 2010 $1.25 million investment).  Until 2009, the Lago Agrio litigation had been funded primarily by Donziger's co-counsel in the U.S., Joseph Kohn, a Philadelphia plaintiffs' attorney.  After Kohn pulled out upon discovering the Cabrera fraud and other fraudulent conduct as a result of

Chevron's Section 1782 proceedings in the U.S., DeLeon became the main funder of the litigation. Ex. 107 ¶¶ 20–25. Donziger would have been unable to pay Ecuadorian attorneys, local counsel in various Section 1782 proceedings, or fund the "cleansing" scheme without funds provided by DeLeon. Ex. 105 (Donziger's August 2010 Chase bank statement showing payments to J. Prieto, P. Fajardo, L. Yanza, The Weinberg Group, and Emery, Celli, Brinckerhoff & Abady, among others following a $1.25 million transfer pursuant to an agreement with Torvia). Snaider was instrumental in procuring that funding.

2.    **Snaider and Nextant Assist in the Procurement of Funding in Furtherance of the Fraud Scheme and Join in Ongoing Efforts to Enforce a Fraudulent Judgment**

According to Donziger, as of November 2010, Snaider did not have a formal role representing the LAPs. Ex. 25 at 100:15–102:18. Nevertheless, prior to that time, Donziger kept Snaider informed about the case, including his efforts to pressure Chevron. Donziger shared his hopes to leverage his relationship with Ecuadorian President Rafael Correa, telling Snaider, "Correa's victory is great for the case," Ex. 108, and "Correa wants to start a fraud case against Chevron." Snaider replied, "That would be awesome. I want in on the case!!" Ex. 109. Snaider forwarded Donziger an article regarding Correa's announcement that "whoever OK'd the past remediation is subject to litigation," calling it "[s]uper news." Ex. 110.

Snaider became more active in the case, however, *after* Chevron procured significant discovery demonstrating the fraud behind the Lago Agrio litigation, after Chevron filed its RICO case, and numerous courts had found *prima facie* evidence of crime/fraud.[5]

---

[5]    *See In re Application of Chevron Corp.*, 749 F. Supp. 2d 135, 140 (S.D.N.Y. 2010); *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 455 (S.D.N.Y. 2011); *Chevron Corp. v. Weinberg Group*,

*(Cont'd on next page)*

In 2011, Snaider and fellow Nextant manager Juan Pablo Navas began work on the "Amazonia Project" which appears to have led to the creation of Amazonia, the vehicle created by the LAPs' representatives in Gibraltar for the management of investment funds and the distribution of proceeds they hope to receive from their efforts to enforce the Lago Agrio Judgment. *See* Ex. 111 ¶ 4 (stating "Amazonia [Recovery Limited] is a corporation that exists to enforce the Ecuadorian judgment against Chevron and to distribute any funds recovered from that enforcement."); Ex. 112 (Snaider emailed Nicolas Economou and William Carmody with an attachment titled, "Amazonia Project—Info Needed 4-13," stating in the e-mail "attached is a brief list of the type of information we would like to review this afternoon"). Snaider was involved in creating the budget to establish and sustain Amazonia's operations. *See* Ex. 113 (Navas forwarded Snaider and Economou a copy of the "Amazonia Budget"); Ex. 114 (Snaider was copied on e-mails related to a meeting with Navas and Economou regarding the "Amazonia Budget"); Ex. 115 (Snaider sent Eoin Beirne of H5 a Power Point presentation with the subject "Amazonia R3").[6]

---

*(Cont'd from previous page)*

Misc. No. 11-409 (JMF), at *5 (D.D.C. Sept. 8, 2011), *vacated on other grounds by Chevron Corp. v. Weinberg Group*, 682 F.3d 96 (D.C. Cir. 2012) (attached as Ex. 55); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 144-45,167-168 (S.D.N.Y. 2010); *Chevron Corp. v. Champ*, Nos. 10-mc-00027 & 10-mc-00028, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Application of Chevron Corp.*, No. 10cv1146-IEG (WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Application of Chevron Corp.* ("Kamp 1782"), Civil Nos. 10-MC-21JH/LFG, 10–MC–22 J/LFG., 2010 WL 9545704 (D.N.M. Sept. 13, 2010).

[6] Amazonia Recovery Limited was ultimately formed in Gibraltar in May 2012. Ex. 116; *see also* Ex. 117. Torvia is among the shareholders of the organizations. *See* Ex. 118. In addition to the planned use of Amazonia for distribution of proceeds from the Ecuadorian Judgment, Amazonia has also been used to collect and distribute funding. *See* Ex. 119 at

*(Cont'd on next page)*

Snaider also participated in negotiations that led to DeLeon's investment into the case. In fact, mere months after the Southern District of New York found there was "ample evidence" of fraud in the Ecuadorian proceedings, *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011), *rev'd on other grounds and remanded sub nom. Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), Snaider was involved in structuring a DeLeon investment and reviewed "final discussion drafts of the [Torvia] funding agreement" in May 2011. Ex. 120; Ex. 121.

Snaider and Nextant were paid handsomely for their efforts to support the LAP team in their ongoing vexatious enforcement efforts. Documents produced during the RICO trial show that Nextant was paid more than $1.3 million dollars between 2007 and 2013 for "enforcement." Ex. 122; Ex. 123.

### 3. Snaider Coordinates with the LAPs to Block Discovery in the RICO Proceeding

As part of the RICO proceeding, Chevron filed a motion to compel the RICO Defendants to produce documents in their control but in the possession of their Ecuadorian co-counsel and agents. The LAPs responded by having their Ecuadorian attorneys bring a collusive action in Ecuador aimed at obtaining a ruling that Ecuadorian law prevented them from providing documents to the LAPs or Donziger for discovery purposes in the U.S. Ex. 124 at 84-87; Ex. 125. Given that he was subject to discovery, Donziger also decided to "temporarily" vacate his position as the LAPs' United States representative. Donziger had Snaider appointed by the

---

*(Cont'd from previous page)*

BPNA02949 (showing April 4, 2013 transfer of $149,000 from Amazonia Recovery Limited to Selva Viva).

LAPs to assume Donziger's title as the LAPs' United States representative.[7]  Ex. 126.

In its opinion granting Chevron's motion to compel the RICO Defendants to produce documents in the possession of the Ecuadorian agents, the New York court found that the purported change in leadership from Donziger to Snaider (and Juan Pablo Saenz) was "an attempt to create a façade to hide reality and to buttress Mr. Donziger's argument that he no longer is in control rather than to portray reality."  Ex. 124 at 77–78.  The New York court also concluded that the *Córdova* action was a collusive lawsuit and that the RICO Defendants used the *Córdova* action and the February 11, 2013 email purportedly appointing Snaider to replace Donziger as a pretense for refusing to produce documents in the possession of their Ecuadorian agents.  Ex. 124 at 84–87.

## C.    The Gibraltar Proceeding

On December 17, 2012, Chevron filed a claim before the Supreme Court of Gibraltar against Gibraltar-based Russell DeLeon and Torvia Limited for their previous and ongoing involvement in the ongoing conspiracy to defraud and extort Chevron.  Ex. 127.  Chevron alleged that they knew or were recklessly indifferent to the commission of the numerous frauds in Ecuador and the United States.  As noted in Chevron's Particulars of Claim, DeLeon and Torvia have provided millions of dollars in funds to support the Lago Agrio litigation and have participated in an unlawful means conspiracy and a conspiracy to injure, and engaged in unlawful interference with Chevron's economic interests.  Ex. 127 ¶¶ 106–10.

---

[7]  Snaider was to serve in this role with one of the LAPs' Ecuadorian attorneys, Juan Pablo Sáenz, an attorney "who has practiced for less than five years."  Ex. 124 at 77.

The Supreme Court of Gibraltar recently denied DeLeon and Torvia's motion to dismiss the case, finding that Chevron had demonstrated sustainable causes of action to support its claims. Ex. 4 (*Chevron Corp. v. James Russell DeLeon and Torvia Limited*, Claim No. 2012 – C – 232 (Supreme Court of Gibraltar)). The decision followed a five-day hearing by the court and its review of thousands of pages of documents, many of which were originally produced to Chevron in Section 1782 proceedings across the United States. *See id.* ¶¶ 3, 6, 41(ii) (noting the voluminous record and information Chevron obtained through 1782 petitions).

In a 72-page opinion, the court rejected DeLeon's and Torvia's claim that Chevron was launching an "impermissible collateral attack upon the decisions of courts of competent jurisdiction in Ecuador." *Id.* ¶ 44. The court noted that it was "not impressed with [DeLeon's and Torvia's] submissions that the [Lago Agrio Court] at first instance disregarded the Calmbacher and Cabrera reports" and was "not convinced" that the Ecuadorian courts considered Chevron's allegations either at trial or on appeal. *Id.* ¶ 48(i), (xvi). The court noted that "[i]f the Appeal court in Ecuador had before it anything like the evidence which has been put before me, it is indeed surprising on the face of it that at the least a rehearing [on Chevron's fraud allegations in the Lago Agrio litigation] was not ordered" and that "it is difficult to envisage how [Chevron] could properly and fairly have contested the [Lago Agrio] proceedings if its allegations of wholesale corruption of the judiciary and Government [of Ecuador] are true." *Id.* ¶ 48(vi), (ix). This ruling paves the way for Chevron to seek discovery in advance of trial.[8]

---

[8] Although Chevron previously subpoenaed Snaider and his consulting firm, Nextant LLC pursuant to Federal Rule of Civil Procedure 45 in connection with Chevron's RICO proceeding in the Southern District of New York, no discovery was taken from Snaider or Nextant. Ex. 137 (quashing subpoena to Snaider).

**D.     Enforcement Proceedings**

As part of the ongoing scheme to defraud Chevron, LAPs' attorneys at Patton Boggs proposed a "multi-jurisdictional strategy" for "expeditiously delivering the Aguinda Plaintiffs [LAPs] their due recovery." RICO Opinion at 686. The strategy called for attacking Chevron "on multiple fronts – in the United States and abroad" in order "to leverage the expense, risks, and burden to Chevron of defending itself in multiple jurisdictions to achieve a swift recovery, most likely by precipitating a settlement. *Id*. at 168. In pursuit of this strategy, the LAPs are already seeking enforcement of the Ecuadorian Judgment against subsidiaries of Chevron in multiple jurisdictions, and plan to file enforcement actions in other jurisdictions. *Id*. at 293.

For example, on June 27, 2012, the LAPs filed an action against Chevron Corporation in the Superior Court of Justice ("STJ") in Brasilia, Brazil, for recognition of the Ecuadorian judgment. *Maria Aguinda et al., v. Chevron Corporation,* Case No. 8542/EC. On March 11, 2013, Chevron filed its opposition to the LAPs' request for exequatur of the Lago Agrio judgment. Ex. 128. Chevron has also submitted several supplemental petitions to provide the STJ with new evidence as it is produced. The action remains pending, and is expected to take several years to resolve. Similarly, on November 21, 2012, the LAPs filed an exequatur complaint in Argentina's National Civil Trial Court 61 against Chevron Corporation for recognition of the Ecuadorian judgment. *Maria Aguinda et al. v. Chevron Corporation*, Case No. 97,260/12. On February 27, 2014, Chevron filed an opposition to the LAPs' exequatur request. Ex. 129. On March 11, 2014, an apostilled copy of the RICO judgment was filed in the Argentine enforcement proceedings. Ex. 130. The action is ongoing.

Further, the LAPs "maintain a list of approximately 30 potential countries that recognize foreign judgments and where Chevron has assets" and have vowed to file enforcement actions in these countries "as necessary to ensure that the full amount of the judgment can be satisfied." Ex. 131; Exs. 132–134.

## III.    ARGUMENT

To obtain discovery under 28 U.S.C. § 1782, the applicant must satisfy the statutory requirements as well as discretionary factors.  The discovery Chevron seeks is highly relevant to the Gibraltar proceeding and the Enforcement Proceedings and meets the minimal showings required by Section 1782.

**A.    The Information Sought Is Highly Relevant and Presumptively Discoverable Under Section 1782**

Where the information sought is relevant, it is "presumptively discoverable" under Section 1782.  *In re Bayer AG*, 146 F.3d 188, 195-96 (3d Cir. 1998) ("relevant evidence is presumptively discoverable under § 1782 . . . .").  Since 2009, Chevron, the LAPs, and the Republic of Ecuador all have sought Section 1782 discovery from multiple sources in aid of ongoing Ecuadorian litigation, as well as the related international arbitration between the Republic of Ecuador and Chevron, including before this court.  *See In re Application of Chevron Corp.*, 736 F. Supp. 2d 773 (S.D.N.Y. 2010); *In re Application of Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010).  All of Chevron's applications have been granted.  Ex. 6.

As discussed above, the discovery sought is highly relevant to the Gibraltar proceeding because of Snaider's involvement in and knowledge of securing funding from DeLeon and Torvia, as well as Snaider's involvement in and knowledge of the creation and use of Amazonia to facilitate funding and distribution of judgment proceeds.  Finally, because of Snaider's

involvement in soliciting and negotiating funding from DeLeon and Torvia, Snaider is likely to have information relevant to DeLeon and Torvia's knowledge of or reckless indifference regarding the fraud in the Lago Agrio and related litigations.

**B.    This Application Meets All Statutory Requirements of Section 1782**

The requirements to obtain discovery under Section 1782 are simple and few:  (1) the order must be issued by "[t]he district court . . . of the district in which [respondent] resides or is found"; (2) the discovery must be "for use in a proceeding in a foreign or international tribunal"; and (3) in the context of this case, the order may be made upon "application of any interested person."  Moreover, the application cannot seek discovery "in violation of any legally applicable privilege." 28 U.S.C. § 1782; *Al Fayed v. United States*, 210 F.3d 421, 422-23 (4th Cir. 2000). There can be no dispute that these requirements are met here.

**1.    Snaider Is Found Within this District, the Discovery Is for Use in Foreign Proceedings, and Chevron Is an Interested Person**

Snaider "resides or is found" in this district as he currently lives and works in Boulder, Colorado.  The discovery here is for use in proceedings before a "foreign tribunal[]," the Supreme Court of Gibraltar, and various enforcement courts.  *See, e.g.*, *Intel*, 542 U.S. 258.  The fact that certain of the Enforcement Proceedings have yet to be filed is of no consequence.  In *Intel*, the Supreme Court held that "section 1782(a) does not limit the provision of assistance to 'pending' adjudicative proceedings" and that "§ 1782(a) requires only that a dispositive ruling . . . be within reasonable contemplation." *Id.* at 253–254, 258–259; *see also, e.g.*, *In re Oxus Gold PLC*, No. MISC 06-82-GEB, 2007 WL 1037387 (D.N.J. Apr. 2, 2007) (noting the petitioner's claims that it "has made plain its intention to pursue litigation" and holding that "the fact that any information elicited pursuant to the Section 1782 Order may not be immediately

presented to the foreign courts does not compel" that the Section 1782 Order be vacated); *In re Application of Winning (HK) Shipping Co. Ltd.*, 2010 WL 1796579 (S.D. Fla. Apr. 30, 2010) (granting application for use in "foreign and international arbitration proceedings that Petitioner *intended* to commence"). Here, there is no question that additional enforcement actions to be filed by the LAPs are within reasonable contemplation. *See, e.g.*, RICO Opinion at 292-93; Ex. 131 (LAPs discussing plans to bring additional enforcement actions).

Chevron is an "interested person" in the Gibraltar proceeding as Plaintiff and a party to the pending Enforcement Proceedings, as well as a party to potential Enforcement Proceedings. *See In re Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) ("The legislative history to § 1782 makes plain that 'interested person' includes 'a party to the foreign . . . litigation.'") (citation omitted); *In re Strand Invs. Ltd.*, No. 09-21985-CIV-MORENO, 2009 U.S. Dist. LEXIS 76445, at *3 (S.D. Fla. July 24, 2009) ("interested person" includes parties to international proceedings); *In re Oxus Gold PLC*, 2007 WL 1037387, at *7 ("The Supreme Court in *Intel* held that the text of § 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant.'") (internal marks omitted).

### 2. The Discovery Sought Is Not Privileged

The requested discovery is not privileged. It is unclear whether Snaider has ever had an attorney-client relationship with the LAPs or Donziger. Donziger and the LAPs have never produced any engagement agreement involving Snaider. At least as late as November of 2010, Donziger testified that Snaider had no formal relationship with the LAPs. Communications between Snaider and any potential or actual litigation funders, including DeLeon and Torvia, are not privileged or subject to work product protection because these funders do not share an

identical "legal" as opposed to "commercial" interest with Donziger and the LAPs. *See U.S. v. Ghavami*, 882 F. Supp. 2d 532, 537-38 (S.D.N.Y. 2012); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Prop. LLC*, No. 01 CIV 9291 (JSM), 2002 WL 1455346, at *1 (S.D.N.Y. July 3, 2002); *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010) (holding that to be privileged, "the 'communication between a lawyer and client must relate to legal advice or strategy sought by the client.'" (quoting *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998))). "[C]ommunications that relate primarily to business matters, rather than legal advice, are not protected." *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, No. 11 Civ. 1299, 2011 WL 5439046, at *3, 9 (S.D.N.Y. Nov. 10, 2011) (ordering disclosure of materials prepared for client by outside counsel that "comment on costs, cash flows, contingency reserves, and schedule, and provide insights on project management"). The LAPs, DeLeon, and Torvia may all want the highest award possible, but they do not have an identical legal interest sufficient for communications between DeLeon, Torvia, and Snaider to receive protection under either the joint defense or common interest privilege. *Cf. Perkins v. Fed. Fruit & Produce Co., Inc.*, No. 11-cv-00542, 2011 WL 6937195, at *4 (D. Colo. Dec. 30, 2011) (finding interests were not identical where the parties "may have shared an interest in minimizing the amount of the settlement in the underlying lawsuits" but did not share other interests related to the litigation). Consequently, disclosure to them constitutes disclosure to a third party, waiving any privilege. 8 Charles Allan Wright, Arthur R. Miller & Mary K. Kane, Fed. Prac. & Proc. § 2016.4 (3d ed.1998).

### 3. The Crime Fraud Exception Applies

Finally, the crime-fraud exception applies to any documents in Snaider's control that

were used to further the fraudulent and criminal scheme against Chevron, including his solicitation of funds that ultimately went to pay Cabrera or that were used for other illicit purposes, and documents and communications related to his coordination with Donziger and the LAPs to block discovery in the RICO Proceeding by purporting to assume Donziger's role as lead U.S. Representative for the LAPs.

"It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984); *United States v. Johnston*, 146 F.3d 785, 795 (10th Cir. 1998) ("The attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud.") (quoting *In re Grand Jury Proceedings*, 857 F.2d 710, 712 (10th Cir.1988)); *In re Grand Jury Subpoenas*, 144 F.3d 653, 659 (10th Cir. 1998) ("The crime-fraud exception applies to both the attorney-client privilege and the work-product doctrine."); *United States v. Sutton*, 732 F. 2d 1483 (10th Cir. 1984) ("The attorney-client privilege does not protect disclosure of plans for future illegal activity."); *Ryskamp ex rel. Boulder Growth & Income Fund v. Looney*, 2011 WL 3861437, at *9 (D. Colo. 2011) ("In Colorado, the attorney-client privilege gives way when the communications between a client and attorney are made for the purpose of aiding the commission of a future crime or a present continuing crime.") (citing *A. v. Dist. Court of Second Judicial Dist.*, 550 P.2d 315, 324 (Colo.1976)).

Here, Snaider solicited funds from DeLeon that were used to bribe Cabrera, which the Southern District of New York has found by a preponderance of the evidence violated the

Foreign Corrupt Practices Act. *See* RICO Opinion at 394–98. He also participated in a scheme to block Chevron's discovery efforts in the RICO Proceeding. *See supra*, Section II.B.5. Accordingly, Chevron has demonstrated "probable cause to believe that a crime or fraud has been attempted or committed and that the communication was in furtherance thereof." *Ryskamp ex rel. Boulder Growth & Income Fund v. Looney*, 2011 WL 3861437, at *9 (D. Colo. 2011); *United States v. Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("We have recently reiterated that a party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof.") (emphasis added); *see also Chevron Corp. v. Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2011) (explaining that the evidence provided must give a prudent person a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud).

Furthermore, circumstances suggest that Snaider was aware of the fraud or became aware of it once Chevron uncovered the truth in U.S. discovery proceedings, and he was also likely aware that he was being made the lead U.S. representative as part of an effort to avoid discovery. But even if he claimed not to be, it is well established that an attorney does not have to be a knowing participant in the crime or fraud in order for the crime-fraud exception to apply. *See, e.g., Clark v. United States*, 289 U.S. 1, 15 (1933) ("[T]he loss of the [attorney client] privilege [does not] depend . . . upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out."); *In re Grand Jury Subpoena Duces Tecum dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (holding that, where there is a reasonable basis to suspect a crime or fraud, communications "are properly

excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose); *United States v. Harnage*, 662 F. Supp. 766 (D. Colo. 1987) ("The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose.") (quoting *United States v. Hodge and Zweig*, 548 F.2d 1347, 1354 (9th Cir.1977)); *United States v. Kerik*, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008) (finding that statements would be "admissible under the crime-fraud exception, even where, as here, the attorney was not a knowing participant in the crime or fraud in question"); *Chevron Corp. v. Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2011) ("In the typical case, the crime-fraud exception may apply even if the attorney is totally unaware of participating in a crime or fraud.").

Numerous courts have already found that the crime-fraud exception applies to various aspects of the scheme against Chevron. *See Chevron Corp v. Donziger*, 11 Civ. 0691 (S.D.N.Y. Mar. 15, 2013), Dkt. 905 at 62 (holding the crime-fraud exception applied to documents held by Patton Boggs regarding "the Calmbacher report, the termination of the judicial inspection process, the selection and appointment of Cabrera, the preparation and submission of his report to the Lago Agrio court, and its presentation as his independent work" and the bribery of Zambrano and drafting of the Lago Agrio Judgment); *Chevron Corp v. Page*, No. RWT-11-1942, Hearing Tr. at 11:13-14 (D. Md. Aug. 31, 2011) (Ex. 135) (applying crime-fraud exception to documents held by LAPs' representative Aaron Page); *In re Chevron Corp.* ("Kamp 1782"), No. 1:10-mc-00021-22 (J/LFG) slip op. at 11 (D.N.M. Sept. 13, 2010) (finding "that . . . discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of

the purported expert reports by the attorneys and their consultants") (Ex. 136); *In re Application of Chevron Corp.* ("E-Tech 1782"), No. 10-cv-1146-IEG (WMc), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010) (upholding Magistrate Judge's application of crime-fraud exception because "[t]here is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own.").  The acquisition of funding from DeLeon, Torvia, and others was and still is essential to the ability to perpetuate the Defendants' scheme, including their current widespread efforts to collect on their judgment in various countries around the world.  *See United States v. Gasparik*, 141 F. Supp. 2d 361, 372 (S.D.N.Y. 2001) (applying crime-fraud exception to communications that were a "necessary step in permitting the fraudulent . . . scheme to advance").  Moreover, in the RICO Opinion, the New York court made extensive findings regarding the fraudulent and criminal conduct of Donziger and other LAPs' representatives in its four hundred eighty-five page opinion.  Communications in furtherance of that conduct are also subject to the crime-fraud exception.

## C.     The Discretionary *Intel* Factors Weigh in Chevron's Favor

The Supreme Court in *Intel* set forth four discretionary factors that "bear consideration in ruling on a § 1782(a) request":  (1) whether Respondent is a "participant in the foreign proceeding"; (2) the receptivity of the foreign tribunal to U.S. court assistance; (3) whether the Section 1782 request is an attempt to "circumvent foreign proof-gathering restrictions"; and (4) whether the documents and testimony sought are "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264–65; *see also In re Chevron*, 753 F. Supp. 2d at 539–41(D. Md. 2010).  These factors all favor allowing the requested discovery.

### 1.    Respondent Is Not a Participant in the Foreign Proceedings

Snaider is not a party to the Gibraltar proceeding or any of the Enforcement Proceedings, and his documents are not within the jurisdictional reach of those tribunals.  Therefore, the first *Intel* factor is met.  *See Intel*, 542 U.S; . at 264; *In re Chevron,* 753 F. Supp. 2d at 539 ("[N]either respondents . . . are parties to the [Ecuador] Litigation or the Treaty Arbitration, so this factor is completely satisfied.").  This is not a situation where "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  *Intel*, 542 U.S. at 264; .  The status of Snaider as a United States resident under the jurisdiction of this Court thus weighs heavily in favor of granting this Application.

### 2.    The Foreign Tribunals Where the Requested Discovery Will Be Used Are Receptive to Assistance Under Section 1782

Section 1782 discovery also is appropriate here because the Gibraltar Supreme Court can receive and act upon Section 1782 discovery in accordance with its own rules of evidence. "Receptivity" is not a question of whether the foreign *court* would permit discovery in this or any other particular case; instead, it is an inquiry into how a foreign *legal system* "might respond to § 1782 assistance from a United States court."  *In re Applic. of OOO Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009) (emphases added); *see also In re Applic. of Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998); *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1100 (2d Cir. 1995) (burden is on party opposing Section 1782 discovery to prove lack of receptivity).  To show lack of receptivity, a party must provide "authoritative proof" that the foreign tribunal would reject the evidence sought under Section 1782.  *See id*.  No such authoritative proof exists here.

Rather, the Gibraltar court is receptive to this discovery as it has already reviewed and

considered thousands of pages of evidence from both Chevron and Defendants DeLeon and Torvia, much of which was obtained through prior Section 1782 discovery proceedings. *Chevron Corp. v. James Russell DeLeon and Torvia Limited,* Claim No. 2012 – C – 232 (Supreme Court of Gibraltar) (stating "[t]he bundles [of document submitted by the parties] contain thousands of pages of documents, including pleadings, statements, and judicial and economic authorities on a wide range of legal issues. I have read them all at least once").

Further, there is no evidence that the courts in Brazil and Argentina would be unreceptive to Section 1782 discovery. *See, e.g.*, *In re IPC Do Nordeste, LTDA, For an Order Seeking Discovery Under 28 U.S.C. 1782*, 12-50624, 2012 WL 4448886 (E.D. Mich. Sept. 25, 2012) ("[T]here is . . . no conclusive evidence that a Brazilian court would be unreceptive to materials discovered here.") (internal quotations omitted); *Pott v. Icicle Seafoods, Inc.*, 945 F. Supp. 2d 1197, 1200 (W.D. Wash. 2013) (noting lack of evidence that Argentinian court would be unreceptive Section 1782 discovery).

### 3. Chevron's Application Is Not an Attempt to Circumvent Foreign Proof-Gathering Restrictions

The third discretionary *Intel* factor, whether the applicant is attempting to "circumvent foreign proof-gathering restrictions," is meant to preclude bad faith misuse of the process. There is no requirement for an applicant to seek discovery of the materials from the foreign tribunal before filing a Section 1782 application. *Intel,* 542 U.S. at 253; ("We now hold that § 1782(a) does not impose . . . a [foreign-discoverability] requirement."); *see also Minatec Fin. S. Á.R.L. v. SI Group Inc.*, No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008); *In re Applic. of Bayer*, 146 F.3d at 196 ("a 'quasi-exhaustion requirement' . . . has been rejected by those courts that have addressed it").

Every court to have considered Chevron's prior Section 1782 applications, including this Court, has found that Chevron's requests for discovery into the ongoing fraud are made in good faith and are not an attempt to circumvent foreign restrictions. *See, e.g.*, *Berlinger*, 709 F. Supp. 2d at 293 (finding that respondents' argument that Chevron attempted to circumvent foreign proof-gathering restrictions "is without merit"); *In re Chevron Corp.*, 753 F. Supp. 2d 536, 540-41 (D. Md. 2010); *In re Veiga*, 746 F. Supp. 2d 8, 25 (D.D.C. 2010).("There is no evidence in the record – none – that would lead this Court to believe that Applicants have sought to circumvent the proof-gathering procedures or policies of the foreign tribunals or otherwise brought their applications in bad faith."); *In re Application of Chevron Corp.*, Misc. No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265, at *4 (N.D. Ga. Mar. 2, 2010) ("[T]here is nothing before this court to suggest that Chevron is attempting to conceal an attempt to circumvent foreign proof-gathering restrictions."); *In re Application of Chevron Corp.*, No. 4:10-mc-134, 2010 WL 8814519, at *1 (S.D. Tex. Apr. 5, 2010) ("The Court finds that the Application does not conceal an attempt to circumvent foreign proof gathering restrictions, and the discovery is not being sought in bad faith.").  Further, Gibraltar is a nation with comparable rules to assist parties in obtaining evidence for use in foreign proceedings, *see* Gibraltar Act No. 1948-10 (Evidence Act) §§ 9–11 (addressing applications for assistance from Gibraltar's courts in obtaining evidence in foreign civil proceedings in another court outside of Gibraltar).

Moreover, Chevron's request for discovery in aid of the Enforcement Proceedings are also made in good faith and are not an attempt to circumvent foreign restrictions.  *See, e.g.*, *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1032 (N.D. Ill. 2006) (finding application for discovery under

Section 1782 was "not an attempt to circumvent Brazilian proof-gathering restrictions and that this factor supports granting the discovery request."). Accordingly, this factor also weighs in Chevron's favor.

### 4. Chevron's Discovery Requests Are Not Unduly Intrusive or Burdensome

The document requests in the proposed subpoena, Ex. A, are neither unduly burdensome nor intrusive. Chevron has tailored its requests to seek only those materials relevant to the Gibraltar proceeding and Enforcement Proceedings. *See London v. Does 1-4*, 279 F. App'x 513, 515 (9th Cir. 2008). The proposed subpoena requests documents relating to Snaider's involvement in and knowledge of securing funding from DeLeon and Torvia and DeLeon's and Torvia's knowledge of or reckless indifference to the fraud in the Lago Agrio and related litigations. Ex. A. Chevron also seeks a deposition of Snaider.

Moreover, Snaider has control over the requested documents maintained in Nextant's various offices, as he would be able to access, use, and send them to various locations in the ordinary course of business whenever the need arises. *Cf. First Nat'l City Bank of N.Y. v. I.R.S.*, 271 F.2d 616, 618 (2d Cir. 1959) ("Any officer or agent of the corporation who has power to cause . . . records to be sent from a branch to the home office for any corporate purpose, surely has sufficient control to cause them to be sent on when desired for a governmental purpose properly implemented by a subpoena"); *see also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614 (2007) (defining possession, custody, and control for purposes of Fed. R. Civ. P. 34 as "actual possession, custody or control or the materials or [if] the party has the legal right to obtain the documents on demand." (internal quotations omitted)).

As a manager and director of Nextant, Snaider "has the legal right to obtain . . . on

demand" any Nextant documents not currently in his possession.  *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984); *Gen'l Envtl. Science Corp. v. Horsfall*, 136 F.R.D. 130 (D. Ohio 1991) (defendant, as Managing Director of non-party corporation "certainly has legal access to and control over the documents at issue."); *see also* Ex. 5 (listing Snaider as manager and director).  Under Texas law, where Nextant is registered, managers of limited liability companies have powers similar to the directors of corporations, including the ability to bind the company and act as the company's agent for purposes of carrying out the company's business.  Tex. Bus. Org. Code § 101.254.  Courts routinely order directors and officers to produce the documents of non-party entities under similar circumstances.  *Gen'l Envtl. Science*, 136 F.R.D. at 133-34 ("An individual party to a lawsuit can be compelled to produce relevant information and documents relating to a non-party corporation of which it is an officer, director or shareholder.") (collecting cases); *Wiwa v. Royal Dutch Petroleum Co.*, Case No. 96 Civ. 8386, 2009 WL 529224, at *2 (S.D.N.Y. Feb. 17, 2009) ("A party's control over third-party documents extends to the records of a corporation for which the party serves as an officer.") (collecting cases).

In short, Chevron has tailored its requests to seek only those materials relevant to the Gibraltar proceeding and Enforcement Proceedings, and obtaining this discovery from Snaider is crucial to Chevron's efforts to uncover further evidence of an ongoing fraud and its financing. *See London*, 279 F. App'x at 515 (no undue burden "[g]iven the need for the evidence and the minimal invasion required" where § 1782 request tailored narrowly).

## IV.    CONCLUSION

For the foregoing reasons, Chevron requests that its application for discovery be granted

and that this court issue the requested subpoenas for document and deposition discovery from

Snaider.

Dated:  May 14, 2014                              Respectfully submitted,
            Denver, Colorado


                                                    /s/Robert C. Blume
KOBRE & KIM LLP                          GIBSON, DUNN & CRUTCHER LLP
Steven G. Kobre                              Robert C. Blume, No. 37130
Carrie A. Tendler                            Allison K. Kostecka, No. 42313
Steven W. Perlstein                          1801 California Street, Suite 4200
Jay Y. Mandel                                Denver, CO 80202-2642
800 Third Avenue                             T:  (303) 298-5700
New York, New York 10022                     F:  (303) 298-5907
T: (212) 488-1200                            rblume@gibsondunn.com
F: (212) 488-1220                            akostecka@gibsondunn.com

STERN & KILCULLEN, LLC                   Randy M. Mastro
Herbert J. Stern                             Andrea E. Neuman
Joel M. Silverstein                          200 Park Avenue
325 Columbia Turnpike, Suite 110             New York, New York 10166
Florham Park, NJ 07932-0992                  T: (212) 351-4000
T: (973) 535-1900                            F: (212) 351-4035
F: (973) 535-9664
                                             William E. Thomson
                                             333 South Grand Avenue
                                             Los Angeles, California 90071
                                             T: (213) 229-7000
                                             F:  (213) 229-7520


                                             *Attorneys for Petitioner Chevron Corporation*